Filed 9/23/13  In re S.L. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re S.L. et al., Persons Coming Under the Juvenile Court Law. | B247263 <br><br> (Los Angeles County <br> Super. Ct. No. CK82068) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>      Plaintiff and Respondent, <br><br>      v. <br><br> M.L., <br><br>      Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marilyn Kading Martinez, Juvenile Court Referee.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Tracey F. Dodds, Senior Associate County Counsel, for Plaintiff and Respondent.

_____

M.L., the mother of S.L. and Janae L., appeals from the juvenile court's orders denying her petition for modification pursuant to Welfare and Institutions Code section 388[1] without a hearing and terminating her parental rights pursuant to section 366.26. M.L. contends she demonstrated changed circumstances following the termination of family reunification services and her frequent, loving contact with the children warranted application of the parent-child relationship exception to termination of parental rights provided in section 366.26, subdivision (c)(1)(B)(i). We affirm.

### FACTUAL AND PROCEDURAL BACKROUND

1. *The Initiation of Dependency Proceedings and Reunification Efforts*

In April 2010 M.L., who was on probation for fraud, lived with her mother, Maria L., and children, two-year-old S.L. and three-month-old Janae. On April 27, 2010 the Los Angeles County Probation Department conducted a compliance check of the home. M.L. was arrested for violating the conditions of her probation after an agent found a blank check and credit cards and mail not belonging to M.L. M.L. admitted to the agent she had smoked methamphetamine on the previous day. The agent requested the Los Angeles County Department of Children and Family Services (Department) conduct a child safety assessment of the home.

M.L. admitted to the investigating social worker she had been under the influence of methamphetamine on April 26, 2010, but said Maria was unaware of her condition because M.L. had left the home to smoke. M.L. also acknowledged there had been ongoing domestic violence in her relationships with the children's fathers, Richard and O.M.[2] Finally, M.L. said she and the fathers had regularly used methamphetamine together. The Department detained the children from M.L. and temporarily placed them in Maria's home.

On April 30, 2010 the Department filed a petition on behalf of S.L. and Janae, alleging violations of section 300, subdivisions (b) (failure to protect) and (g) (no

---

1    Statutory references are to the Welfare and Institutions Code.

2    The fathers are not parties on appeal.

2

provision for support) arising out of M.L. and the fathers' past drug abuse, M.L's current drug abuse and the fathers' unknown whereabouts and failure to provide for the children. At the detention hearing the juvenile court found a prima facie case for detaining the children and ordered them placed in the home of Maria with monitored visits by M.L., who was in custody at that time.

In a June 18, 2010 jurisdiction/disposition report the Department recounted an interview with M.L. in which she explained she had begun using methamphetamine in 2000, when she was 21 years old, and was a "functional addict" until the end of 2007 when she was arrested for forgery while pregnant with S.L. She had been ordered to attend a 12-step program, which she completed. With respect to the domestic violence disputes between M.L. and the fathers, the report noted both men had threatened to kill M.L. and Maria had seen bruises on M.L's. face. The report further stated M.L. had moved into a sober living home after her release from custody; Maria and the children were living next door.

On June 18, 2010 the Department filed a first amended petition removing the allegation M.L. had a current problem with methamphetamine and adding allegations M.L. was the victim of domestic violence perpetrated by O.M. and Richard. M.L. and the Department successfully mediated the first amended petition. M.L. agreed to complete a parenting program, participate in a drug-testing program, participate in a substance abuse program if she missed or had a positive drug test and participate in individual domestic violence counseling. She further agreed the children would be placed with Maria. M.L. was allowed to live in the home as long as she complied with her case plan and tested negative for drugs. At the July 23, 2010 jurisdiction and disposition hearing, continued from June 18, 2010, the court declared the children dependents of the court and made orders consistent with the mediation agreement. M.L. was warned she had only six months for reunification due to the age of the children.

A little more than three weeks later M.L. tested positive for amphetamine and methamphetamine. She moved into her adult nephew's home, and the Department informed her she had to enroll in a substance abuse program. Although M.L. complied,

on September 30, 2010 a treatment center counselor informed the Department it was going to discharge M.L. because her attendance was inconsistent and she had not been in compliance with the outpatient treatment agreement. In October 2010 M.L. began participating in the center's intensive outpatient program, including attending parenting classes, but she tested positive for amphetamines, methamphetamine and cocaine metabolites on November 4, 2010. She did not appear for the November 19, 2010 drug test.

In a report prepared for the six-month review hearing (§ 366.21, subd. (e)), the Department recommended the children remain suitably placed with Maria and M.L. receive six additional months of reunification services. The Department explained M.L. had been participating in individual therapy sessions and had accepted responsibility for her actions, but was struggling with sobriety. The Department described M.L.'s visits with S.L. and Janae, occurring four to five times a week, as appropriate. She openly hugged and kissed the children, and they appeared attached and comfortable with her. Maria reported M.L. "was very motherly and always addresses the children's needs"; but, occasionally M.L. was offensive to Maria, accusing her of not properly using Department funding for the children. At the January 21, 2011 hearing the court ordered the children remain suitably placed and M.L. continue to receive reunification services.

On February 24, 2011 the Department was informed M.L. was "referred to a higher level of care" because she had attempted to falsify a drug test, failed to complete her writing assignments and "appeared to not make a commitment to comply with her treatment program requirements." M.L. enrolled in another treatment program in March 2011, but was terminated from that program a month later after she had failed to attend meetings. In its June 2011 report for the 12-month review hearing (§ 366.21, subd. (f)), the Department recommended reunification services for M.L. be discontinued and proceedings continued for the adoption of the children by Maria. The Department explained M.L.'s visits with the children had become infrequent (once per month), M.L. argued with Maria during the visits, M.L. had failed to drug test since December 2010, her whereabouts were unknown and it was unknown whether she was receiving

4

treatment.  M.L., however, appeared at the 12-month review hearing and requested the matter be set for a contested hearing.  At the July 27, 2011 contested hearing the court terminated M.L.'s reunification services and set a section 366.26 selection and implementation hearing.

For the next 13 months the matter slowly proceeded while Maria's adoptive home study was prepared and the juvenile court was confronted with evolving circumstances: O.M, who had been incarcerated, was released and indicated he wanted to care for S.L.; S.L. was assessed as in need of mental health services because she had expressed fear of M.L., who would raise her voice toward Maria in front of S.L.; and Maria requested conjoint counseling with S.L. to improve communication between the two.

2. *The Section 388 Petitions*

On August 27, 2012 M.L. filed a petition under section 388 requesting the court order further reunification services and unmonitored visitation.  As support for the threshold determination of changed circumstances, M.L. stated she had been in a residential treatment program since June 24, 2012, participated in counseling, parenting and drug education classes, tested negative for drugs and visited the children on a weekly basis.  On September 20, 2012 the court denied the petition in light of M.L.'s long history of substance abuse and short time in the new treatment program, but suggested it might be persuaded to grant a future petition.

Less than a month later the residential treatment facility informed the Department M.L. was going to be discharged from the program because she had made contact with an abusive boyfriend, who was about to be released from prison, in violation of the facility's instruction not to do so.  A letter to the Department stated, "Client was placed on a safety plan due to her repeated refusal to comply with the rules.  Client did make some progress with learning to adapt and begin working on behavioral change.  From the beginning client has struggled with her feelings for her abusive boyfriend who was incarcerated the whole time she was in treatment.  He was recently released on 11/20/2012.  It is this writer's opinion that client's behavior changed and her focus was not on herself and her children anymore.  Client began contacting this person . . . .  It is the opinion of the

5

treatment team that client was no longer willing to work on her issues and remain focused on treatment therefore client discharged as of 11/28/12." M.L. told the Department she believed she had been wrongfully discharged and only emailed the former boyfriend to say goodbye.

On December 21, 2012 M.L. filed a second section 388 petition seeking additional reunification services, contending she had attended the residential treatment program from June 24, 2012 through November 28, 2012 and participated in counseling, drug education classes and drug testing. She asserted it would be in the best interests of S.L. and Janae to provide her with additional reunification services because she lived in the same building as the children, visited frequently and the children were closely bonded to her.

At the previously scheduled January 7, 2013 section 366.26 selection and implementation hearing, Maria confirmed she wanted to adopt the children and said she did not believe M.L. should be given another chance. Counsel for M.L. requested the section 388 petition be set for a hearing so she could provide additional information in support of the petition, including a letter attesting M.L. had completed the treatment program and made substantial progress.

The court denied M.L.'s request for a hearing on the section 388 petition and summarily denied the petition itself, explaining, although the letter indicated M.L. had completed a five-month program, "These children have been before this court for a little more than two and a half years at least in part due to their mother's substance abuse. She entered a program approximately two years after the petition was filed, which was approximately one year after the court terminated reunification services. She completed a five-month residential program. . . . There's no evidence she's in an aftercare program. . . . At any rate, she did very well in her residential treatment program, but she is at the beginning of addressing her issues. Given a very long history and five months of participation in a program, I cannot find it is in the children's best interest to grant the request or set the matter for hearing." Also finding the children had resided for a

substantial period of their lives with Maria, the only person they had known as their caretaker and who wanted to adopt them, the court terminated M.L.'s parental rights.

## DISCUSSION

1. *The Trial Court Did Not Abuse Its Discretion in Denying M.L.'s Section 388 Petition*

Section 388 provides for modification of juvenile court orders when the moving party presents new evidence or a change of circumstances and demonstrates modification of the previous order is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *In re Y.M.* (2012) 207 Cal.App.4th 892, 919; see Cal. Rules of Court, rule 5.570(e).)[3] To obtain a hearing on a section 388 petition, the parent must make a prima facie showing as to both of these elements. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1504; *In re Justice P.* (2004) 123 Cal.App.4th 181, 188.) The petition should be liberally construed in favor of granting a hearing, but "[t]he prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; accord, *In re Brittany K.*, at p. 1505; see *People v. Bell* (1989) 49 Cal.3d 502, 554 [prima facie evidence is "such proof as will support a ruling or order in favor of the moving party if no controverting evidence is presented"] (conc. opn. of Kaufman, J.).) "[T]o be entitled to a hearing . . ., [the parent is] not required to establish a probability of prevailing on [his or] her petition." (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Justice P.*, at p. 189.)

Even if a parent presents prima facie evidence supporting the allegations contained in the petition, however, "[a] petition [that] alleges merely changing circumstances and

---

3    Section 388 provides a parent or other interested party "may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . . [¶] . . . [¶] . . . If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held . . . ."

7

would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47; accord, *In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)  The parent must also "show that the undoing of the prior order" would be in the child's best interests.  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529; accord, *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child.  [Citation.]  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child." (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.)

We review the summary denial of a section 388 petition for abuse of discretion. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358; *In re Brittany K*., *supra,* 127 Cal.App.4th at p. 1505.)  We may disturb the juvenile court's exercise of that discretion only in the rare case when the court has made an arbitrary, capricious or "patently absurd" determination. (*In re Stephanie M., supra,* 7 Cal.4th at p. 318.)  We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court.  (*Id.* at pp. 318-319.)

In the case at bar the juvenile court did not abuse its discretion in summarily denying the section 388 petition.  Although five months of sobriety is commendable, given M.L.'s eight-year history of substance abuse and the fact the five months did not begin until 11 months after reunification services had been terminated, her circumstances were changing, not changed.  (See *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [mother and father's three-month old rehabilitation was not changed circumstances; "both have extensive histories of drug use and years of failing to reunify with their children"].)

8

Even if M.L.'s petition sufficiently demonstrated changed circumstances, moreover, her explanation as to why it would be in the children's best interest to delay selection of a permanent home falls woefully short. To be sure, "best interests is a complex idea." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530.) Among the factors to be considered in determining whether to grant a section 388 petition are the seriousness of the problem that led to the dependency, the reason the problem continued, the strength of the parent-child and child-caretaker bonds, the length of time the child has been in the system, the nature of the change of circumstance, the ease by which the change could be achieved and the reason the change did not occur sooner. (*Id.* at p. 532.) In support of her best-interests claim, M.L. contends only that she lives in the same building as the children (although she had been in a residential treatment program for an extended period), visits frequently and has established a bond with them. Those circumstances do not outweigh the gravity of M.L.'s almost decade-long struggle with addiction, the length of time the proceedings have been pending and the children have been with Maria, the fact Janae was only three months old when she was initially detained and that mental health services were required for S.L. because of her fear of her mother. The juvenile court did not abuse its discretion in finding the presumption a permanent plan is in the children's best interest had not been rebutted.

2. *The Court Did Not Err in Terminating M.L's Parental Rights*

Section 366.26 directs the juvenile court in selecting and implementing a permanent placement plan for a dependent child. The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) Once the court has decided to end parent-child reunification services, the legislative preference is for adoption. (§ 366.26, subd. (b)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["[i]f the child is adoptable . . . adoption is the norm. Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"]; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235 ["[o]nce services have been terminated, the

9

juvenile court's focus shifts from family reunification to the child's permanent placement and well-being, and the burden accordingly shifts to the parent to show that a termination of parental rights is not in the child's best interests"]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" and the court then must "concentrate its efforts . . . on the child's placement and well-being, rather than on a parent's challenge to a custody order"].)  When the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of six enumerated exceptions applies. (§ 366.26, subd. (c)(1)(B); see *In re Matthew C*. (1993) 6 Cal.4th 386, 392 [when child adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is relatively automatic].)

To satisfy the subdivision (c)(1)(B)(i) exception to termination M.L. asserts here, a parent must prove he or she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W*. (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].)  The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].)  No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life."  (*In re Andrea R*. (1999) 75 Cal.App.4th 1093, 1108; see *In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418.) The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared

10

experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

M.L.'s argument she has had loving, frequent contact with S.L. and Janae during most of the time the family has been involved with the dependency system, and the children viewed her as their mother, is not supported by the record. Although the Department described visitation in its January 21, 2011 report as frequent and "very appropriate" with loving and maternal conduct, the Department's June 24, 2011 described an entirely different scenario: "During this period, mother has had infrequent visitation with the children, approximately one visit per month. . . . [Maria] reported mother to be very difficult, and indicated she could no longer monitor. . . . [Maria] had reported when mother[] visits, they are too short and she does not make the time to engage with the children. [Maria] further disclosed mother did not take the children anywhere, and constantly argued with her in front of the children." Indeed, S.L. required mental health services because she was afraid of M.L., who raised her voice at, and argued with, Maria in front of S.L.

While M.L. may have subsequently become more present and active, her claim she saw the children virtually every day in the seven months preceding the section 366.26 hearing is similarly unsupported by the record. The Department's report states, as of November 15, 2012, M.L. "calls and speaks with the children on a daily basis," not that M.L., who was in a residential treatment facility, visited with them daily. Regardless whether the visits during those seven months were daily or weekly, M.L never moved beyond monitored visitation, a touchstone for the establishment of the parental role critical to the section 366.26, subdivision (c)(1)(B)(i), parent-child relationship exception. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 622 ["K.P. had been removed from Kimberly G.'s custody when he was less than one month old, and Kimberly G. had never

progressed beyond monitored visitation"].)  With a prospective adoption in place, the juvenile court did not abuse its discretion in terminating M.L.'s parental rights.

**DISPOSITION**

The orders of the juvenile court are affirmed.


PERLUSS, P. J.


We concur:



WOODS, J.



ZELON, J.